We'll move next to Appeals 23-1527 and 23-2566. UIRC-GSA Holdings v. Blair & Company and Colt will begin with oral argument from Mr. Schultz. Thank you very much, Your Honor. This is a lot of issues addressed in the briefs, but I'm going to try and confine my focus today to sort of the heart of the case. And at its heart, this is a copyright case, and it's kind of an unusual copyright case. It's unusual in the sense that the legal issues it presents are somewhat different than the legal issues that come up in most of the copyright cases that this court sees. And part of the reason for that is that the investment itself that's at the heart of this case is an unusual investment. And I think it's worth making sure everybody's on the same page about why that is and how it works. So UIRC's business is basically to acquire and manage properties leased to the federal government, the GSA. And there are some unusual risks attendant to that business model. The government obviously is not your standard tenant, and they are driven by different motives than other private investors. The government also typically insists on short-term leases, so you don't have a 10- or 12-year lease where at least you're locked in and you can plan. And the government frequently takes the whole building. So now you've got a real combination of risks that are attendant to this business model, and a lot of people aren't comfortable with those risks, and so they stay away. UIRC then, in trying to raise money, added yet an additional complication by saying, what we're going to try and do is go into the bond market and raise enough money that we can buy a package of these properties, 10, 12, a dozen of them. So now you've added yet another group of risks to your plate in the sense that you now have 12 of these risky properties that people are wondering about. So UIRC, looking at this, essentially had a decision to make. Can we get into the bond market and convince sophisticated investors, because the money we're talking about we're going to need to go after sophisticated investors, to put money into this? And essentially they said, we're going to give it a shot. And so to do that, they knew essentially they had to present this investment opportunity in a way to satisfy two pretty sophisticated groups of people. First of all, the bond rating agencies who would look at this and give it a bond rating. And then secondly, the investors themselves who were going to have to decide whether to put their money into this deal. To do that, they had to present the investment to the community in a way that got people to put a lot of money on the table and give them a lot of money. In doing so, there's two basic documents they had to draft, two basic documents that come into play. One is what we call the CPM-PPM prospectus, the sales document that basically the investors get. And then there's the indenture of trust, which is the legal document, the roadmap that spells out, okay, this is where everybody's rights and obligations and responsibilities are. And the two have to work together. They do work together because if they don't work together carefully, you've got a securities law problem. So you have to sort of tie the two of them together. So UIRC went and decided to try and do this. They did get this Idaho bond document to start at the beginning of the process. But it's important to understand that transaction, while it was a bond transaction, was very, very different than what we're talking about. That was a deal to build a research facility and labs at Idaho State University. So from the perspective of the bond buyers, very, very different transaction, different set of risks, different set of incentives, different money flow, all of those kinds of things. So while, yes, there are in any bond transaction, there are a lot of what we lawyers might call boilerplate provisions that are common to pretty much any transaction. You also had here the heart of the deal, which is UIRC had to find a way to draft these key provisions addressing the key risks in a way that would convince the bond agencies to rate the bonds properly and then bond buyers to buy them. And so that's what it did. And it drafted these provisions. What are the provisions that mainly are important? Well, there are two, sort of. There are two kinds of provisions. First, there are the provisions that talk about the risks, that talk about how we're going to deal with the risks of this. There's repositioning procedure provisions. There's extraordinary redemption provisions. And essentially what those talk about is, okay, so what does happen if we give you this money for 12 properties and it turns out two of the deals fall through and you've only got 10 properties instead of 12? Or what happens if you get all these 12 and a year after we get into this, the government decides to move all its operations from this one building to Alexandria, Virginia, and all of a sudden now we've got an empty building in our portfolio? And so there are provisions to deal with those risks. And then the second important one, and this is the one we put in the appendix to the brief, of course, is what we might call the application of revenues or the waterfall provisions, follow the money. You know, that's obviously always central to every bondholder is where's the money going to come in and where does it go once it comes in and how is it going to be managed and a thousand questions about how all that works. So UIRC did just that. Drafted those provisions, those key provisions, essentially from scratch, and it did use boilerplate for a lot of the stuff that nobody reads, quite frankly, in the end. Okay? It did that. Still couldn't get Moody's or Fitch or S&P to rate the bonds. These were still unusual enough that those agencies wouldn't touch them. But they were able to get the NAIC to give it what they call a shadow rating so that insurance companies could buy them. And then they went out and sold these bonds successfully and went through four different versions of this essential same transaction where they got groups of properties using this process. The second one was a little different because they got off track a little bit and it didn't work as well. So with the third and the fourth, they went back to their original model. Third and the fourth is where they brought Blair in to work with them. And the transactions were successful. There's no question about it. They sold the bonds. Blair did a fine job as the placement agent. There's no dispute about that. Got the buyers in. And then what happens is that while they're working on UIRC-5, the fifth set of these transactions, the Blair folks say to themselves, hey, UIRC's on to something here. We can make some money on this. What we need to do is go out and find somebody else who's willing to take this model and we'll take UIRC's documents and use them to help somebody else do these kinds of deals and make all this money. And that's essentially what they did. Exactly what they did is they took UIRC's copyrighted PPMs and their indenture of trust and they sat down and essentially copied them. And, yes, a lot of the stuff they copied was boilerplate stuff that we don't care about and that we don't claim a copyright over. But a lot of the stuff that they copyrighted was the heart of the documents, the essence of the documents. These repositioning procedure documents, the special redemption, and the waterfall documents that were really the essence of what, at least in our view, and I think the evidence backs us up on this, made this a successful transaction. So that's why I say, in this sense, this is kind of an unusual copyright case. Because most of the copyright cases, like, for example, the Design Basics cases that have been in front of this court the last couple, the last three, I think, copyright cases, turn into more typical issues of access and copying and, you know, is there access? Well, we don't even know if there's access. We can't prove there was access. And, therefore, it's hard to be sure about the copying part because we don't even know if they saw this particular thing. There's no dispute about any of that here, at least, you know, certainly for purposes of summary judgment. Yes, they might quibble a little bit on a bit of this. But on summary judgment, there's just no dispute that they had our documents, that they copied our documents, and that they used our documents to help Rainier engage in pretty much the same transaction. So the question simply, then, is from a copyright perspective, should they be able to get away with that? Judge Gettleman's answer was, we find it a little short because it basically boils down to the one sentence where he says, well, you know, the problem is that your copyright, even if we focus on what you call the heart of it or what he called, I forget the exact terminology he used, but, you know, the heart of the documents, there's unprotectable facts, fragmented phrases, functional phrases akin to instructions, and subjects that can only be expressed in certain words. And our response to that is, at least initially, well, if you're going to start breaking down page after page of text, and the text that we're talking about here, at least the essence of it, goes on for six, seven, eight, nine pages, if you're going to start trying to break that down into individual facts, individual phrases, then copyright law is going to disappear because you could do that for war and peace, you could do that for pretty much anything, if you try to break things down like that. And in the Bucklew case, I think this court said pretty clearly, that's just not something that works in the copyright sense. The other two things that Judge Gettleman pointed to, and again, he did all this without really tying his comments to any specific language in any of the documents, he just sort of threw it all into a big bushel basket and said, it's all part of this. Functional phrases akin to instructions and subjects that can be expressed only in certain ways. The certain ways one, it's interesting to think about because the evidence on that is just squarely the opposite. There is really no dispute that you could do this other ways, it's a logical matter. There is no reason to think that somebody couldn't sit down and write a description of an investment in a bunch of GSA properties and write it in a completely different way than UIRC wrote it. There's a logical matter, no reason why somebody couldn't do that. The experts, both experts, our expert and their expert agree with just that, that there's no reason that somebody couldn't have sat down and written, did just what we did, and write it up a different way using different language, et cetera, et cetera. And then third, it was done. In UIRC's second transaction, the one I alluded to a minute ago, UIRC sort of, I say kind of got off track, but they just sort of, they still hadn't kind of figured out the formula yet, so they went in a little bit of a different direction with the documents, and it didn't work. But they were able to go in a different direction, it just didn't work. And then Rainier, after they discovered the problem, because at the end of the day, what came out is that Rainier had no idea that Blair had taken our language to draft Rainier's documents. So Rainier said, well, okay, let's try and do one of these without using UIRC's language, and they did. They tried to do without either Blair or our language. They tried to do another deal, coming up with different language using their own language. That transaction didn't work, but the point here is simply that there's no dispute, there shouldn't be any dispute that this is something where they could come up with their own language if they wanted to, that other people can come up with their own language. We are not saying anything other than, we're not trying to say that nobody else can do a deal like this. This isn't like a patent case where you might say, hey, we have a patent over this, you can't manufacture this item, or at least you can't manufacture and sell it, because our patent gives us the right to keep you from doing that. We're not trying to take the position that nobody else can go out and do what we did and bring a deal like our deal to the market. You just can't use our words to present it to the market. That's basically what the copyright laws are about, is the idea, and that's the heart of what we're saying here, is that the real problem here was that they used our words to present their deal to the market, and that's the essence of our claim. So with the court's permission, I'll save the rest of my time for rebuttal. Very good. Thank you, Mr. Schultz. We'll now move, Ms. Henning, to you. Argument on behalf of the appellee. Morning, Your Honor's name. Morning. We do agree about one thing, that a copyright suit over bond documents is unusual. We disagree a little bit about why it's unusual, but we agree it's unusual. But I will say the case went from unusual to frankly a bit flabbergasting when William Blair learned through discovery sent to a third-party law firm that UIRC itself copied most of the language over which it was claiming copyright from a third party and did not have permission to do so. After being confronted with that fact, UIRC attempted to, in the course of summary judgment briefing, change the scope of its copyright claims to only those portions that were edited, in other words, only their edits over those other documents. But that can't carry the day for UIRC for at least two reasons, or both. One is that at best, even if you accept many of the premises of UIRC's arguments, that would create a derivative work that it did not have permission to use and thus would not be copyrightable. But second, and as Judge Gettleman ruled, the edits are not original enough to warrant copyright protection. I'd like to start with the argument on derivative work because that was addressed in the reply brief, so I'd like to respond to a couple of arguments made in the reply brief. Essentially, UIRC is trying to press an argument here that was expressly rejected in this court's Pickett case, which is, I'm not trying to copyright the copyrighted thing. I'm trying to copyright my changes to the copyrighted thing, and those are original and those are different. Pickett directly rejected that argument, and it explained why. It explained why because if you're trying to talk about alterations to the original, you're going to create all kinds of problems for courts because it's going to be very hard to know who had the first one. You're going to have alterers suing alterers and claiming that they were the first to get there, and the act is designed so that only the original copyright holder is the one who can control subsequent use of that work,  UIRC says no, that's not the case. If you look at the Schrock case, that shows you otherwise. The Schrock case, first of all, cites Pickett and does not purport to overrule it, so it absolutely does not even portend to overrule Pickett, but more to the point, Schrock is deciding a different issue. In Schrock, what happened was a photographer photographed a Thomas the Train engine, which is a copyrighted image, and eventually the people who make Thomas the Train who gave that photographer permission to make those photographs, for a while they had a great relationship. The Thomas the Train people were paying the photographer to use that work in their marketing. They eventually reached an impasse, and the photographer wanted to continue using his work, and the Thomas the Train people said, no, it's a derivative work, and you don't have our permission to use the copyright. And what this court said was, when you gave the photographer permission to photograph the train, you implicitly, unless you agreed by contract otherwise, gave him the copyright to that derivative work. That's a totally different issue than what we're talking about here. No one's contending that anyone from Idaho gave UIRC permission to use this language, so Schrock doesn't help. The only other argument UIRC really has on this derivative issue is to say that essentially the argument would need to presume that the Idaho language is copyrightable. That argument can't succeed for a few reasons. First and foremost in my mind is that the edits to the Idaho documents can't be more original than the documents themselves. In other words, if the Idaho documents are not original enough to copyright, then by necessity edits to them are not. And so it's sort of implicit in their own argument that the Idaho documents are copyrightable. But even setting that aside, UIRC has said to the court below that number one, their complaint attaches some of that Idaho language and claimed copyright over it. Their interrogatory responses use some of that exact same Idaho language and claimed copyright over it. And they submitted it to the Copyright Office and claimed and obtained copyright over it. So at this point, UIRC can't be heard to say that it's not copyrightable. It's simply accepting the premises of their own prior representations to courts. In fact, they're likely stopped from arguing otherwise at this point. And finally, the district court, it's kind of a related point, is allowed to use interrogatory responses and complaints to determine the scope of the claim, which is what the court did here. So that also prohibits an argument that somehow there's an implicit or a presumption of copyrightability of the Idaho documents because UIRC has said that themselves in this litigation. So copyrightability of the Idaho documents is implicit in UIRC's own argument. So that brings us to the originality argument. We view the derivative work argument as frankly the easier route because you can accept a lot of premises from UIRC, premises that we frankly disagree with, but you can accept them and still rule against them because at best it gets them a derivative work. But we also believe that Judge Gettleman was correct in saying that the language at issue here is not copyrightable. Importantly, I heard for the first time an argument today about redemption provisions. I haven't seen that before the court. There was no, here is the exact language we're talking about, court.  But there was no, here's the exact sentence that conveys this argument so eloquently and it could have been said differently, this is what you should be looking at and let me explain to you why this is so very original. There's none of that. Instead, we got the edits are original and so you should look at the edits. Next, if you look at the Taflo case, which is cited in our brief, this court rejected a similar attempt to, after the fact, show how language could have been drafted differently. The Taflo case was about a, it was a case with scientists and I have to admit the science was a little bit beyond me, so pardon me if I butcher the facts a little bit, but essentially there was a scientific paper about how particles behave, a model about how particles behave at the University of Chicago and later work incorporated that model and the copyright holder on the words describing the model said, well, you could describe that model a bunch of different ways. It's essentially the same argument being made here and we're not trying to copyright the idea, which everyone agreed that they couldn't do, but we're just trying to copyright the manner in which we express this and the court actually mentioned expressly in the opinion, yes, on appeal, they did list a few different ways in which you could, in theory, phrase this differently, but they didn't do it before the district court and so it's waived and if you look in the district court, you're not going to find, here's the sentence with the concept and here's the three other ways you could have phrased it and you didn't. You're just not going to find that in the summary judgment record. You'll find references to a different deal, but a different deal is not, here's the way you could phrase that and if you look at the language, it's pretty clear why because the language is things like if we get some funds, here's how we're going to apply them. They're very factual. You can't say I'm going to apply these funds in the order of X, Y, and Z very many ways while clearly expressing how you're going to apply the funds and as we note in our brief, for very basic legal provisions like that, and I do emphasize that these are documents that are complying with regulatory requirements. A private placement memorandum is essentially a prospectus, but private, so you're complying with disclosure obligations and the indenture is a legal document. It's kind of like a contract or something. It sets out the terms and so in legal documents like this, you want to encourage people to be able to rely on the kinds of language that courts understand, that lawyers have understood, so that there's no confusion among anybody. So if you look at these edits, they're things like that, they're things that both are and should be expressed only in certain ways. Other edits include fund names, changing fund names, changing singulars to plurals, changing defined terms from one defined term to a different term. I mean these things are clearly not original enough to warrant copyright protection. One brief thing about the waterfall provision, even now, even though the waterfall provision is expressly mentioned in UIRC's brief, they did not explain exactly what words in that provision are so creative and why exactly those words could not be expressed another way, and so that also speaks volumes. And presumably this should have been very easy for them to do, both below and on appeal, if, as they testify, they spent six months painstakingly drafting this purportedly new language. I'd finally like to address the argument that somehow the district court erred by looking at individual phrases instead of looking at the entire work. What is at issue here now are individual phrases, because they have and had to concede that large portions of the text over which they initially claimed copyright are not in fact copyrightable to them because they are not original to them. They were not drafted by them. So the copyright claim is over individual phrases, and that's the entire point. The district court surely did not err by analyzing the isolated things over which copyright is even arguably applicable to. Unless the court has any questions on Mr. Colt, the jury demand, or fees, I'm happy to give the remainder of my time back to the court, but I do request that the court affirm the district court's order and in your opinion if you could please extend the order to the fees on appeal. Thank you. Thank you very much, Ms. Henning. Mr. Schultz, we'll go back to you and give you one minute for rebuttal. No dispute. We went to the copyright office at the beginning and said, here's our stuff, we want a copyright. The copyright said, do you want a copyright? The copyright office said, do you want a copyright over the whole thing? We said, nope, just the new language that we have, we're not claiming a copyright over the whole thing. The copyright office said, fine, gave us our copyright. Sure, the copyright office could have said, hey, spell it out for us. Tell us which is which so that we know. The copyright office didn't. Secondly, when Blair took our stuff and copied it for Regnier, Blair could have come to us and said, hey, we looked at your copyright and we noticed you never told the copyright office what you're claiming a copyright and what isn't and we know a lot of this stuff isn't copyrightable, so tell us. Tell us where you really think you got a legitimate copyright claim and what's the boilerplate that we can copy. They didn't do that. They just took it and copied it. Third, in Discovery, in this case, they claim, well, we still have no idea what's copyrightable. They went through this in deposition after deposition. They took both of the UIRC principles. They did a 30B6 deposition of UIRC. They took expert depositions. They took our lawyer's deposition. Again and again, what exactly are you claiming a copyright over? What exactly are you claiming a copyright over? It was spelled out for them in exhaustive detail. In essence, it's the stuff I talked about before. That's the heart of where the copyright is. That's got nothing to do with the Idaho document. There's no GSA properties and multiple properties in the Idaho document. This is all unique to our transaction. And then there are other peripheral provisions that are tied to that. That's the essence of the claim. Thank you very much, Mr. Schultz. Thank you, Ms. Henning. The case will be taken under advisement. Thank you.